J. W. PENDERGRAST AND WIFE, CATHERINE W. PENDERGRAST v. R. C. AIKEN AND WIFE, M. E. AIKEN, W. L. AIKEN AND PERRY ALEXANDER CONSTRUCTION COMPANY

No. 7628SC561

(Filed 5 January 1977)

Nuisance § 7; Waters and Watercourses § 3— culvert in bed of stream — flooding — nuisance — effect of factors downstream — instructions

Where, in an action to recover damages from flooding allegedly caused by a nuisance created when defendants placed a 36-inch culvert in the bed of a stream flowing from plaintiffs' land onto and through defendants' land, the jury raised a question about the effect of evidence of the inadequacy of two 24-inch culverts which were located under a public street and carried water from defendants' property, the trial court did not err in instructing the jury that "if you find that the damage was not caused by the creation of a nuisance, but was caused by something further downstream, then plaintiffs could not recover."

Judge MARTIN dissents.

APPEAL by plaintiffs from Martin (Harry C.), Judge. Judgment entered 26 January 1976 in Superior Court, BUNCOMBE County. Heard in the Court of Appeals 18 November 1976.

This is an action to recover damages allegedly sustained by plaintiffs as the result of a nuisance allegedly created by defendants.

The parties are adjoining property owners. Plaintiffs' property is about 60 feet wide and is bordered on the north by Summit Avenue, on the east by U. S. Highway 25 and on the south by defendants' property. Defendants' property is bordered on the east by U. S. 25 and on the south by Allen Avenue.

A stream enters plaintiffs' property on the north by a 30-inch culvert located beneath Summit Avenue. The stream flows in a southerly direction through plaintiffs' property and enters defendants' property at their common boundary. The stream goes over defendants' property and, at the time the alleged damages were caused, exited defendants' property on the south through two 24-inch culverts under Allen Avenue, defendants' south boundary. The two 24-inch culverts have since been replaced with two 60-inch culverts.

From Summit Avenue south the land of both plaintiffs and defendants slopes, generally, towards the stream and the Allen Avenue culvert.

Defendants placed a culvert about 280 feet long in the stream bed beginning at a point near plaintiffs' land and running in a southerly direction to a point near the two 24-inch culverts under Allen Avenue. The culvert installed by defendants was 36 inches in diameter.

Plaintiffs offered evidence tending to show that on several occasions, following heavy rains, after defendants installed the 36-inch culvert, the stream became impounded on plaintiffs' property behind the 36-inch culvert and the embankment above the culvert. The impounded water backed into the basement of plaintiffs' building and caused damage. Plaintiffs' evidence also tends to show that water did not enter the building prior to the installation of the culvert on defendants' land. One of plaintiffs' witnesses testified that he had been a tenant in plaintiffs' building since 1966 and that prior to 1973, he had never seen the stream out of its banks. (The culvert installed by defendants rises 36 inches above the stream bed. The top of the eastern bank of the stream is only 12 and 18 inches above the bed of the stream.)

Plaintiffs offered an engineer who testified that the 36-inch culvert installed by defendants was inadequate for the anticipated load of water. The engineer admitted, nevertheless, that the 36-inch culvert installed by defendants would carry a greater volume of water than the combined capabilities of the two 24-inch culverts under Allen Avenue at the south of defendants' property.

Defendants offered no evidence. The verdict on the issues was as follows:

"1. Did the defendants Aiken create a nuisance by installing and covering a 36-inch drain across their property?

ANSWER: Yes.

2. If so, did the defendants Aiken thereby cause damage to plaintiffs' property?

ANSWER: No."

Pursuant to Rule 59, plaintiffs filed a motion requesting that the verdict be set aside and a new trial. A hearing was held on plaintiffs' motion, and it was denied.

*Wesley F. Talman, Jr., for plaintiff appellants.*

*Morris, Golding, Blue and Phillips, by William C. Morris, Jr., and Steven Kropelnicki, Jr., for defendant appellees.*

VAUGHN, Judge.

Plaintiffs bring forward one assignment of error based on the sustaining of an objection to a question posed by him to one of his witnesses. The assignment of error cannot be sustained. The question was leading as well as argumentative. Moreover, what the evidence would have said does not appear in the record. Plaintiffs contend that what the witness would have said is clear from his previous testimony. If that is so, plaintiffs could not be prejudiced because the jury obviously heard the preceding testimony.

Plaintiffs bring forward a number of other assignments of error, all of which are based upon a single exception to supplementary instructions given by the judge in response to questions posed by the jurors after they had been given the case.

There is not a single exception to the charge as originally given by the court. We start, therefore, with the assumption that the judge fully, fairly and properly declared and explained the law arising on the evidence.

In order to consider defendants' exception, it appears necessary to set out what took place on the occasion when the jury returned to the courtroom:

"JUROR # 9. I have been appointed foreman. There is a question in regard to the act of God definition. It was pointed out, as I understood it, that if within a certain cycle you could expect a certain volume of rain, could reasonably expect, then it was not an act of your God, but if it was so unusual you couldn't anticipate it, then it was. But now what type of a cycle: ten years, five years, two years, one year?

COURT: I don't know that the instructions I gave you covered that precise question. Let me see.

First of all, the term 'act of God' applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them. That doesn't precisely go to your question.

FOREMAN: That would include all history in the area, wouldn't it?

COURT: Use the word 'history'. Now let's see.

The owner of a barrier to surface water is not bound to provide against floods of which the usual course of nature affords no premonition. An extraordinary flood is one the coming of which is not to be anticipated in the natural course of nature. An ordinary flood is one the repetition of which, although at uncertain intervals, can be anticipated. The fact that similar floods had occurred has been held to tend strongly to show that they are not so extraordinary and unusual that they might not have reasonably expected to occur.

FOREMAN: Yes, sir, I believe—

COURT: —we come to answering your question.

FOREMAN: —that clarifies it a good bit.

Pendergrast v. Aiken

COURT: All right, sir.

FOREMAN: One other thing—two other things, actually. One of the members asked, first of all, it is possible to answer yes to question # 1 and no to question # 2? That's a possibility.

COURT: Yes.

(Jury retires to assume their deliberations at 9:10 a.m.)

MR. TALMAN: May it please the court, Your Honor, the jury has a question.

(10:00 a.m.)

SHERIFF KINCAID: The jury would like to have the exhibit for the month of March, the rainfall.

COURT: Do you gentlemen have any objection to them having that exhibit?

MR. MORRIS: I'll have to find out Your Honor. Just a second.

(Counsel approach the Bench. Colloquy off the record.)

COURT: Let the record show that the jury requests the weather data for the month of March, 1973, being a part of Plaintiffs' Exhibit 16. Defendants Aikens' counsel objected to a part of Exhibit 16 being given to the jury during its deliberations, and counsel for the plaintiffs stipulated that all of Exhibit 16 could go to the jury. Defendant Aikens' counsel objected to any or all of Exhibit 16 being sent to the jury. The Court in its discretion will allow all of the Exhibit 16 to go to the jury room.

(Plaintiffs' Exhibit 16 taken to the jury room by the court.)

MR. MORRIS: Exception.

(Jury returns into open court at 12:14 p.m.)

COURT: Sheriff, if you will get those papers and bring them to me.

All right, members of the jury, I'll let you go take your lunch. Come back about a quarter to two, about 1:45. Is that all right?

FOREMAN: Yes, Your Honor. There is one point of law that either now or when we return—

COURT: Well, ask me about it now and maybe I can think about it.

FOREMAN: It concerns the property holder accepting the water from the person above them, and, in particular, that law in itself, and how it is governed by an intervening property holder of where there's property higher here, one in between, and one below. Where they're on a hill, however it would be governed by. In other words, whether—if the intervening water holder, or rather, property owner accepted the top, but it could not be released to the one lower than him and how that would affect the first property holder.

COURT: All right. You all may be excused. Come back about 1:45.

(After lunch recess.)

(IN THE PRESENCE OF THE JURY.)

COURT: Now let me see, members of the jury, if I can answer your question.

Let me remind you that this case is concerned with the rights between Mr. and Mrs. Pendergrast and the Aikens with reference to the Pendergrast property and the Aiken property which lies adjoining and to the south of the Pendergrast property.

All of the evidence in the case tends to show that the property occupied by the Aikens to the north or upstream from the Pendergrast property is not owned by the Aikens, but rather is owned by some other parties whose names were mentioned in the evidence, I don't recall, and the Aikens leased that property from them. So you're concerned with the rights between Pendergrast and his property and the Aikens' property lying adjoining it and to the south.

Now with that in mind, the law confers on the owner of each upper estate, such as the Pendergrast estate with reference to the southerly Aiken estate, an easement or servitude in the lower estate, the Aikens estate, for the drainage of surface waters flowing in its natural course and manner without obstruction or interruption by the

owners of the lower estate to the detriment or injury of the upper estate. Each of the lower parcels along the drainway is servient to those on the higher levels in the sense that each is required to receive and allow passage of the natural flow of the surface water from the higher land. Since the lower property is servient to the upper property, the property located upstream, the lower property is not permitted by law to interrupt or prevent the natural passage of water to the damage or detriment of the upper adjoining landowner.

Now does that answer your question, Mr. Foreman?

FOREMAN: No, sir. Our question really concerns the release of the water from the Aiken property onto Allen Street versus—in other words, if the release of the water onto Allen Street is limited beyond the limitation placed by the Aiken property, how that would affect it.

COURT: Now let me see if I can answer your question. Is your question this: if there is more water coming off of the Aiken property than the Allen Street culverts can handle, how does that affect the lawsuit?

FOREMAN: Yes, sir.

COURT: Speaking about the two twenty-four inch culverts going under Allen Street.

FOREMAN: If the thirty-six inch culvert releases more water than the two twenty-fours will handle, therefore it's backed up because of that, how does that affect it?

COURT: Well, let me say this: now the plaintiffs have the burden of proof on each issue, and the plaintiffs have the burden to prove that by the installation and covering of the thirty-six inch culvert the defendants created a nuisance, and that the creation of that nuisance is what caused the damage to their property.

COURT: Now, if the jury finds that the plaintiffs have failed to prove that the creation—well, first of all they've got to prove there's a nuisance. If you find that they do prove that there's a nuisance, now then if you fail to find that the plaintiffs have satisfied you that they were damaged as a result of the creation of the nuisance, then the plaintiffs cannot prevail. Now if the jury finds that the

plaintiffs' damage is not caused by the creation of a nuisance by the defendant, assuming that you find they have created a nuisance—I don't mean to infer what your verdict should be on that issue, but if you find that the damage was not caused by the creation of a nuisance, but was caused by something further downstream, then the plaintiffs could not recover.

Does that answer your question?

FOREMAN: Yes, sir.

COURT: All right. Here are your papers. (Jury retires to resume their deliberations at 1:56 p.m.)

COUNSEL FOR THE PLAINTIFF WAS GRANTED PERMISSION TO APPROACH THE BENCH, OBJECTS TO THE COURT'S SUPPLEMENTAL INSTRUCTIONS TO THE JURY WHICH OBJECTION IS DENIED BY THE COURT.

MR. TALMAN:                    EXCEPTION NO. 9

(Jury returns into open court at 2:02)

COURT: Take the verdict, please, in PENDERGRAST v. AIKEN."

We have considered all of plaintiffs' arguments in support of the exception and conclude that plaintiffs have failed to present prejudicial error.

The burden was on plaintiffs to satisfy the jury by the greater weight of the evidence what damages, if any, they sustained by reason of defendants' action. The jury was at liberty to believe all, part or none of the testimony of any witness. It was for the jury to determine what inference could be drawn from any of the evidence and the importance that would be given that evidence. We agree with plaintiffs when they say they offered substantial evidence that would have permitted the jury to answer the issue of damages in some amount favorable to plaintiffs. We cannot agree, however, that the evidence compels such an answer in favor of them, the party with the burden of proof.

Appellate courts should not attempt to second guess the jury and order a new trial merely because they may disagree with the verdict. The judge who tried the case had the discre-

tionary power to set the verdict aside and, in his sound discretion, declined to do so.

It appears that the jury was diligent in its deliberations. Among other things they asked for additional instructions on flooding resulting from an act of God. They had previously been told that "[a] person whose acts joined with an act of God in producing injury is liable therefor." Over defendants' objections they were allowed to take local rainfall charts with them to the jury room. Obviously, plaintiffs were not entitled to recover damages unless the damages were caused by a nuisance created by defendants. When the jury raised the question about the inadequacy of the two 24-inch culverts under Allen Avenue, the judge could not express an opinion on the weight of the evidence in that regard.

Obviously, the jury could not answer the second issue in favor of plaintiffs unless they found that defendants' nuisance was a cause of plaintiffs' loss. That is precisely what the judge told the jury. In an abundance of fairness to plaintiffs, nevertheless, the judge did not rest with that short, but obvious declaration. He repeated much of his earlier charge relating to the duty defendants owed plaintiffs, in an accurate statement of the law as it applied to the evidence in the case being tried.

No error.

Judge BRITT concurs.

Judge MARTIN dissents.